FILED
OCT 26 2018

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY_____ DEP CLK

WMG

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:18-CR-00062

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL INFORMATION |
| ) | |
| ROBERT PAUL MAGLICIC, JR. ) | |
| LISA CAROL RAYMOND ) | |

The United States Attorney charges that:

## I. STATUTORY AND REGULATORY BACKGROUND

### A. GENERAL BACKGROUND ON MEDICAID

1. Medicaid is a federal health care benefit program that helps pay for reasonable and medically necessary services for enrolled individuals, referred to herein as "beneficiaries." Medicaid is administered by state governments. In North Carolina, Medicaid is administered by the North Carolina Division of Medical Assistance (DMA). In South Carolina the Medicaid program is administered by the South Carolina Department of Health and Human Services (hereinafter "SCDHHS"). The Medicaid program, DMA, and SCDHHS are collectively referred to herein as "Medicaid." Medicaid pays for covered medical services of its beneficiaries, who are generally low income individuals.

1

2. If qualified, individuals can enroll to become Medicaid beneficiaries. At the time of enrollment, a beneficiary receives a unique alphanumeric code that is issued by the program. This code is known as a Medicaid Identification Number. Similar to traditional insurance, beneficiaries may use their Medicaid Identification Numbers to receive covered medical services.

3. Medicaid beneficiaries receive services from medical practitioners and companies referred to as Medicaid "providers." Once a provider enters into a contract with Medicaid, the program issues a unique number to the provider, known as the "provider number." Providers must also obtain a federal identification number, known as National Provider Identifier, or "NPI" number. All Medicaid providers must certify that they will only bill the government for services that they actually render.

4. After a provider renders a covered medical service to a Medicaid beneficiary, the provider may bill Medicaid for the reasonable and necessary costs of the service. To bill Medicaid, providers generally send an electronic claim to a processor for the program. Providers may also hire billing companies or contractors to perform the task of submitting claims to Medicaid for payment; however, the provider is responsible for ensuring that the programs are only billed for services that the provider

2

actually renders.

5. In each claim transmission, the provider must enter truthful information concerning the services it performed. The claim transmission generally includes, but is not limited to, the date of the alleged service, the Medicaid Identification Number of the beneficiary, the nature of the service rendered, and the provider number. Providers are not required to send in copies of medical records or other forms of proof to justify the claim. The electronic claim is generally all that is required to receive payment from Medicaid.

6. While Medicaid claim processors may reject a claim if, for example, the provider or beneficiary is not enrolled, claim processors do not generally contact the beneficiary or provider before payment is made to confirm that the billed services were actually provided. They also do not typically review medical records or other underlying documentation to substantiate the billed services. Instead, Medicaid presumes the truth of each claim, and generally pays providers for the services that they bill. In other words, Medicaid entrusts its providers to only submit claims for the services that they actually perform.

7. Although Medicaid does not generally scrutinize claims before payment, Medicaid retains the right to audit providers after

3

payment has been made. As such, providers are obligated to retain original source records, such as medical records, charts, or other documents, that tend to show the nature of the services actually rendered by the provider. In the event that Medicaid agents discover that an electronic claim is not supported by the underlying documentation, the program may recoup those funds from the provider, or impose other sanctions.

B. COVERAGE FOR BEHAVIORAL HEALTH SERVICES

8. Some of the services covered by Medicaid include Behavioral Health Services ("BHS"), which include behavioral modification and psychotherapy.

9. As with other covered services, a provider of BHS is required by Medicaid to maintain clinical service notes and other medical records for a period of five years in order to document and substantiate any reimbursement requested from Medicaid. Not only are the clinical service notes a requirement under Medicaid policy, they are necessary to ensure that these recipients receive the care that the Medicaid funds are designated to provide, by giving an account of the efficacy of the individualized plan of care.

10. Minimum documentation requirements for BHS generally consist of a full clinical service note for each date of service,

4

written and signed by the clinician who provided the service. Medicaid policy requires that service notes include the following:

- Patient name
- Service record number
- Medicaid identification number
- Service provided
- Date of service
- Place of service
- Type of contact (face-to-face, telephone call, collateral)
- Purpose of the contact (tied to the specific goals in the plan)
- Description of the provider's interventions
- Amount of time spent performing the service
- Description of the effectiveness of the interventions in meeting the recipient's specified goals as outlined in the individualized plan of care.
- Signature of the individual providing the service.

## II. FACTUAL BACKGROUND

11. During times material to this Information, S.S. was an individual who operated numerous mental and behavioral health services companies in North and South Carolina. These companies included, but were not limited to Carolina Support Services LLC ("CSS"), and Southern Support Services, LLC ("SSS"). CSS was a Medicaid provider that purported to render BHS to children in various counties within North Carolina, including counties within the Eastern District of North Carolina. SSS was a Medicaid provider that purported to render BHS to children in various counties within the District of South Carolina.

12. A.B. worked for S.S. at CSS and SSS. A.B. had masters

5

degrees in business administration and education, and an undergraduate degree in accounting. A.B. also had experience in billing Medicaid for BHS.

13. ROBERT MAGLICIC was the Regional Director of Operations for various providers owned or managed by S.S., including CSS and SSS. ROBERT MAGLICIC worked from various locations, including North Carolina, South Carolina, and Florida.

14. LISA RAYMOND was the Corporate Office Manager for CSS and SSS. RAYMOND worked primarily in the offices of CSS in Greenville, North Carolina.

15. By in or about November of 2014, S.S. had caused SSS to bill Medicaid for more than $339,107.18 in BHS that had not actually been rendered by SSS. In November of 2014, a Medicaid case reviewer contacted employees of SSS for the purposes of conducting an audit of medical records supporting BHS billings to Medicaid. MAGLICIC, RAYMOND, and A.B. caused medical records to be fabricated to support prior BHS billings to the Medicaid program.

16. On or about March 26, 2015 a Medicaid case reviewer in South Carolina conducted an onsite visit to SSS to conduct a Medicaid audit. Specifically, the reviewer requested that SSS produce a sample of 160 patient medical records, to include

individual plans of care, assessments, consent forms, and clinical service notes. Even though no such plans of care, assessments, and clinical service notes existed, an SSS staff member told the reviewer that the clinical service notes were maintained electronically and that they would be dropped off with the South Carolina Medicaid program within 48 hours.

17. Thereafter, between March 27, 2015 and March 30, 2015, A.B., MAGLICIC, RAYMOND, and others conspired to fabricate clinical services notes relating to the 160 patient medical records to make it appear that the services had actually been performed.

18. To carry out the scheme, MAGLICIC, RAYMOND, and others created a series of fake personnel files by using personal information and data from employees of CSS. MAGLICIC, RAYMOND, and A.B. then conspired to create fake service clinical service notes using the stolen employee data. RAYMOND was responsible for affixing the stolen employee's signature onto the patient medical records as though they had performed the work and written the clinical service notes.

19. On or about March 30, 2015, MAGLICIC personally delivered the fraudulent clinical service notes to Medicaid. In total, MAGLICIC supplied the South Carolina Medicaid program approximately 160 fraudulent patient medical records to the South

Carolina Medicaid program. The fraudulent notes purported to justify approximately $34,646.69 worth of Medicaid expenditures paid to SSS.

## COUNT ONE
### *Conspiracy to Commit Health Care Fraud*
### *18 U.S.C. § 1349*

20. Introductory Paragraphs 1 through 19 are realleged and incorporated by reference into this Count.

### The Conspiracy

21. Beginning at a time unknown, but no later than November 1, 2014, and continuing through in or March 30, 2017, within the Eastern District of North Carolina and elsewhere, the defendants ROBERT MAGLICIC and LISA RAYMOND, did knowingly combine, conspire, confederate, and agree with others known to the United States Attorney, to commit offenses against the United States, to wit, to knowingly and willfully execute and attempt to execute a scheme and artifice to: (1) defraud a health care benefit program, to wit, Medicaid, and (2) obtain by means of materially false and fraudulent pretenses, representations, and promises, any of the money or property owned by, and under the custody or control of said health care benefit program; in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

## Purpose of the Conspiracy

22. It was the purpose of the conspiracy for SSS, S.S., A.B., ROBERT MAGLICICA, and LISA RAYMOND, and other conspirators, to benefit from the creation and submission of false medical records to the South Carolina Medicaid program.

## Overt Acts

23. In furtherance of the conspiracy, and to effect the objects thereof, there were committed in the Eastern District of North Carolina various overt acts, including, but not limited to the following:

a.) A member of the conspiracy gathered a list of patient medical records to be fabricated for delivery to the Medicaid program;

b.) A member of the conspiracy acquired personnel file information from CSS for use on SSS patient medical records;

c.) A member of the conspiracy fabricated patient medical records and clinical service notes corresponding with dates of service previously billed to the Medicaid program;

d.) A member of the conspiracy affixed an electronic signature to the fabricated patient medical records; and

e.) A member of the conspiracy delivered the fabricated patient medical records to the Medicaid program.

9

All in violation of Title 18, United States Code, Section 1349.

## FORFEITURE NOTICE

Each named defendant is given notice that all of the defendant's interest in all property specified herein is subject to forfeiture.

Upon conviction of the offense set forth in Count One of the Information, the defendant shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7) and Title 18, United States Code, Section 981 (a)(1)(C), the latter as made applicable by 28 U.S.C. § 2641(c), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

The forfeitable property includes, but is not limited to, the gross proceeds personally obtained by each defendant.

If any of the above-described forfeitable property, as a result of any act or omission of a defendant --

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third party;

(3) has been placed beyond the jurisdiction of the court;

(4) has been substantially diminished in value; or

10

(5) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

ROBERT J. HIGDON, JR.
United States Attorney

BY: WILLIAM M. GILMORE
Assistant United States Attorney